NelsON, J.,
delivered the opinion of the Court.
The defendant- in error, being a minor, brought this action under the Code, 3400, which declares that “any *267 words written, spoken or printed of a person, wrongfully and maliciously imputing to such person the commission of adultery or fornication, are actionable, without special damage.” Such words were not actionable at common law, and redress against such slander could be obtained in England through the spiritual’ courts only; but they have been actionable here since the act of 1804, ch. 1; 1 Scott’s Rev., 852. The declaration is for verbal slander. Issue was taken upon the plea of not guilty, and after one mistrial, verdict and judgment was rendered in favor of the plaintiff below for one thousand dollars and costs, from which plaintiff in error appealed.
On the trial, in the Court below, two witnesses testified to the speaking, by plaintiff iii error of part of the words laid in the declaration, and clearly imputing fornication. These witnesses were assailed, in the progress of the cause, by their own admissions that they were unfriendly to plaintiff in error, and- were further attacked, partly by proof as to contradictory statements, and in part by evidence discrediting them from their general reputation: but a larger number of sustaining witnesses swore, that, from their knowledge of their general characters, they were entitled to credit upon oath. Some of the witnesses thus testifying were in turn assailed; but as the credibility of all the witnesses was peculiarly and appropriately a question for the jury, it is not necessary, under a long and well established rule of this Court, to enter upon a critical and extended examination of their respective claims to credit.
The general character of the defendant in error, as to chastity, was also assailed upon the trial; and it was *268 shown by the evidence of ten witnesses, varying much in their degrees of knowledge, that her general reputation before the commencement of the suit was that of an unchaste woman, while upon the other hand, five witnesses testified as ‘to her good character in that respect; and it may be inferred from the entire pi’oof that she was quite young, and had established no very general character of any sort.
It is impossible, however, after a careful examination of the entire evidence set out in the record, to avoid the conviction that the verdict was rendered in favor of a plaintiff of doubtful character, upon the evidence of witnesses of doubtful credit. While this conviction does not, of itself, afford sufficient ground upon which to reverse the judgment, it imposes a more imperative duty to scrutinize the incidents attending the trial, and to consider the errors in law which are alleged to have occurred during its progress.
It seems, from the evidence, that one of the sons of the plaintiff in error was, in the language of the witnesses, engaged in “courting” the defendant in error; that her chief witness was the Mercury, or go-between; that her suitor had sent her “a white handkerchief with four grains of spice in it,” axrd that she had sent him “a letter containing a hickory tooth-brush and three grains of spice.” What enigmatical meaning was attached to •these symbolic missives, or whether they were to be regarded as signifying love or hatred, or as dimly foreshadowing the action of slander, does not appear from the record; but .it does clearly appear that the son’s courtship was carried on without the knowledge *269 of his father or mother; that his. mother, on discovering the letter,, threw it into the fire and burned it; and that his father was so exasperated, that “he whipped him severely with a switch, and cut the blood out of him, .about the letter.” It may be inferred, though it is not clearly proved, that, soon after the discovery made by the parents, the principal witness, who. had acted as the mutual friend of “the young people,” visited the plaintiff in error at his house; and. on the way from it to his still-house, plaintiff in error told the witness that “he had a crow to pick with him, bcause. he understood witness had been courting between his son Thomas and the plaintiff.” The witness denied it. The plaintiff in error then swore that the defendant in. error was a very mean woman, and charged that he had caught her in the act of fornication with a person named, who after-wards swore, upon the trial, that no such occurrence took place.
The slanderous words were proven by two brothers, testifying to the same conversation, and do not seem to have been uttered on any other ocasion. It seems that one of the sons of plaintiff in 'error was, during the interview or altercation, called in to prove the agency in the courtship of the principal witness, who became infuriated, drew bis knife and made strong threats. There is also evidence tending to show that both witnesses for defendant- in error were intoxicated, or under the influence of liquor, at the time of the alleged conversation. One of the sons of the plaintiff in error testifies that he heard all the conversation; that no charge of fornication was made; but that his father did say, with an oath, *270 ■that “he was a poor man, and before his son should marry into such a family, he would kill him, and bury him on credit;” and this latter statement is substantially corroborated by two other witnesses.
Without analyzing the other evidence, as to the contradictory statements alleged to have been made by the principal witnesses as to what occurred at the time of the utterance of the alleged slanderous words, it is obvious, from the facts appearing in the record, that his Honor’s charge to the jury was not sufficiently full and explicit as to the rules by which they were to be governed in weighing the credibility of the witnesses; and that, as given, the charge was calculated to mislead.
After stating, very briefly, that a witness may be discredited by the evidence of witnesses who would not believe him on oath, from their knowledge of his general character; or sustained, in like manner, by witnesses who would believe him; that he may be impeached, by proving that he made “certain material statements” which he denies; or that “his swearing in reference to material matters may be contradicted by the testimony of other credible witnesses in reference to the same matters,” his Honor instructed the jury further, as follows: “When a witness’s credit is questioned, you try it as you would try any other fact in the lawsuit, looking to all the evidence in the case bearing upon that subject, and determine whether he is worthy of credit or not.”
But, in order to enable the jury, in view of all the evidence in this cause, intelligently to try the fact of the credibility of the two leading witnesses for the plaintiff below, his Honor should have told the jury, in accord- *271 anee with Kincheloe v. The State, 5 Hum., 9, 13, that “the fact that the character of a witness is assailed by a single witness casts a reproach upon it, and it then becomes a question to be decided upon by the jury, like all other questions of fact, and 'is to be judged of, not by the number of witnesses, but by their respectability and intelligence, consistency, and means of information; and that the character of a witness for veracity does not stand as if unimpeached, when it is assailed and sustained by an equal number of witnesses.”
The jury, therefore, do, when the credit of a witness is assailed, try the question as they would try any other fact “-in the lawsuit;” but they must try it under instructions as to the rules of evidence appropriate to the question, of which the rule cited is of great practical consequence in civil as well as criminal cases. This important rule, so necessary for the guidance of the jury, was approved by this Court, in Whiteside v. The Stale, 4 Cold., 180.
While the Circuit Judge is under no obligation to charge the jury upon abstract or irrelevant propositions, yet it is his duty, in civil as well as in criminal cases, to charge- the law arising upon the facts in every case, not in remote and impalpable generalities, but as applicable to the facts, so as to aid the jury in arriving at a correct conclusion. See Wilson v. Smith, 5 Yer., 379; Turbeville v. Ryan, 1 Hum., 113. See, also, 5 Yer., 453; 2 Swan, 237; 1 Head, 209; Ib., 610; 2 Head, 565.
The record in this cause shows, further, that: “The Court was asked by the defendant to charge the jury, *272 ¿hat if they believed, from the evidence in the cause, that the words spoken by the defendant were spoken in heat of passion or anger, it would be a circumstance to which the jury might look, in mitigation of damages; but the Court refused so to charge, and the defendant excepted.”
The conflict in the authorities upon this question is more apparent than real. It is generally conceded that, in actions of libel or slander, where the occasion and circumstances of publishing the libel or speaking the words impose upon the plaintiff the necessity of proving a dishonest or malicious intention in fact, the evidence offered to rebut it is properly admissible under the general issue. See 1 Vend. Stark, on SI., 454; 2 Greenl. Ev., § 421. And “where the defence is, that the libel or words were published or spoken, not in the malicious sense imputed by the declaration, but in. an innocent sense, or upon an occasion which warranted the publication, this matter may be given in evidence under the general issue, because it proves that the defendant is not guilty of the malicious slander charged in the declaration.” 2 Saund. PI. and Ev., 2d ed, 325.
Within this principle are embraced words lawfully spoken by counsel; matter contained in a petition to Congress or the State Legislature; or in articles of the peace; or in judicial proceedings, and the like. 16., 325; 2 Greenl., § 421; 3 Steph. N. P., 2579. And it is well said that “The defendant, under tbe general issue, may give in evidence any matter which tends to disprove either the speaking of the .words or the publication of the libel, to bar tbe action or rebut tbe evidence of *273 malice or of special damages.” 3 Steph. N. P., 2579; 2 Stark. Ev., 3d ed., 638.
Applying these principles to the case at bar, no satisfactory reason is perceived for the refusal to charge the jury that, if the slanderous words were uttered in the heat of passion or anger, that fact might be looked to in mitigation of damages. The • evidence was not, and in the state of the pleadings, could not have been, offered in justification. But from the proof in the record, as to the chastisement of his son by the plaintiff in error, it may be reasonably inferred that the son was a minor ; and looking to all the evidence, it is manifest that the slanderous words were spoken, or are alleged by the plaintiff in error to have been spoken, in the course of an altercation with a person whp, as he believed, was aiding his son to marry contrary to his wish. Now, if the father entertained the opinion that his son was about to form an injudicious or improper matrimonial engagement, or to unite himself in marriage with a woman whom he regarded as of doubtful character, and that the witness was using every effort in his power to bring about so unfortunate an alliance, was it unlawful in him — solicitous, as he doubtless was, for the welfare of his son — to remonstrate with the witness against his interference? Was it unnatural that, having heard of a scheme which he considered disastrous to his son's happiness, he should commence the conversation in an irritated mood, or that he should become irritated in the course of the altercation which immediately occurred between another son and the witness, and when the witness himself drew his knife and became infuriated? And if, in such a “storm of *274 passion,” he uttered language in regard to the plaintiff, which, in his cooler moments, he could not justify, why should the jury be precluded from looking to the mitigating circumstances under which he acted? If provocation, in its legal sense, will reduce a homicide, which, but for the provocation, would be murder in the first degree, to manslaughter, why may not passion and anger be considered as mitigating the atrocity of libel or slander? Few, if any, civil injuries are greater than those which result from cool, deliberate, malicious and premeditated libels; and one of the best modes of preventing such injuries, and the mortal combats too often resulting from them, is, for the juries of the country to give redress by exemplary damages. But there is a wide difference between malicious and remorseless slander, and words spoken in the heat of blood and under provocation; and we hold that a jury, in fixing the measure of damages, should be permitted to consider all the circumstances of mitigation, as well as of aggravation.
In 1 Hilliard on Torts, 3rd ed., 405, § 70, it is said: “ It has been held that, in an action of slander, the defendant may show, in mitigation of damages, that he was incited and provoked to the utterance of the words, by some act or declaration of the plaintiff, contemporaneous, or nearly so, with them, if shown to have been the immediate and proximate cause or provocation. It is not sufficient, although it is necessary, to show that it occurred and was communicated to the defendant before the speaking of the words. But this may be proved by the defendant’s own declaration, and the jury is to determine whether the language which the defendant used *275 was used because of sucb provocation received from the plaintiff. So, in actions for libel, though the defendant cannot give in evidence, in mitigation of damages, a distinct and independent libel on himself, published by the plaintiff; yet, where the publication' is so recent as to afford a reasonable presumption that the libel by the defendant was published under the influence of the passion excited by it, or when it is explanatory of the meaning of or occasion of writing the libel complained of, sueh evidence is admissible, although the libel complained of does not expressly refer and profess to be a reply to the former publication, if such reference appears on comparing the two.” Various cases are cited by the author in support of these propositions, which we adopt as a correct exposition of the law.
It has been ingeniously argued for the defendants in error, that it should have been proven by plaintiff in error, that the alleged provocation immediately preceded the speaking of the slanderous words, and was occasioned by the defendant in error herself, and not by another. In answer to this, it may be observed- that the authority cited does not require that the provocation should immediately precede the utterance of the words, but that the act or declaration of the plaintiff should be contemporaneous, or nearly so, with them; and, upon the facts in this case, it should have been left to the jury to determine whether the witness, to whom the words were' spoken, was the agent of defendant in error, and whether the plaintiff in error had shortly before discovered the correspondence with his son, and in good faith believed that it was the purpose of the defendant in error to inveigle *276 him into a marriage to which he, the father, had lawful reasons to object.
His Honor, the Circuit Judge, said, in his charge to the jury: “As to the amount of damages, this is a question for your determination, looking to all the facts and circumstances in the case;” and it has been urged, with much plausibility, that, as the jury was directed to look to all the facts and circumstances, this authorized the consideration of all matters of p'rovocation established by the proof. This would, perhaps, have been the case but for the special request of plaintiff in error for special instructions on this subject. The refusal to give the instructions asked for was equivalent to an expression of opinion, on the part of his Honor, that if the words were spoken in heat of passion or anger, the circumstance could not be looked to in mitigation of damages.
On the trial of this cause, the plaintiff in error offered, in various forms, to prove the character as to chastity of the family in which the defendant in error resided at the time of the alleged slander, and to show that, prior to that time, she resided in the same house with her mother and sisters, and that “the general reputation and belief of the community was, that their said house ^vas a common rendezvous, where lewd men met, and engaged in acts of adultery and fornication with the inmates of said house.” But his Honor refused to allow such proof to bo made; and it is insisted, for plaintiff in error, that this is ground of reversal. *277 of damages.” 1 Greenl. Ev., § 424. And whatever controversy may have existed on the subject, we regard it as equally well settled, that “the defendant may impeach- the plaintiff’s character by general evidence, in order to reduce the amount of damages.” Ibid, § 424.
*276 “It is perfectly well settled that, under the general issue, the defendant cannot be admitted to prove the truth of the words, either in bar of the action or in mitigation
*277 Mr. Starkie, in his treatise on the law of slander and libel, has happily observed that: “General evidence to show that the plaintiff, previously to the alleged slander, labored under a general suspicion of having been guilty of similar practices, seems, in principle, to be admissible, as immediately and necessarily connected with the question of damages. He complains of loss of reputation, and that he has been deprived of his character by the act of the defendant. Is not the defendant, then, to be permitted to show that the plaintiff’s character - was previously tainted with suspicion, or that he had, in fact, little character or reputation to lose. To deny this, would be to decide that a man of the worst character was entitled to the same measure of damages with one of unsullied and unblemished reputation; a reputed thief would be placed on the same footing with the most honorable merchant — -a virtuous woman with the most abandoned prostitute. To enable the jury to estimate the probable quantum of injury sustained, a knowledge of the party’s previous character is not only material, but seems to be absolutely essential.” 2 Wend. Stark, on SI., 78. But, while such is the general doctrine, it is no less a firmly established principle that particular facts, forming links in the chain of circumstantial evidence against the plaintiff, to establish the proof of the charge, can not be re- *278 ceivecl in evidence under the general issue in mitigation of damages. Ibid, 90, 97.
If the plaintiff in error had pleaded a plea of justification, evidence that the defendant in error lived in a bawdy house, with knowledge of its character, would, perhaps, have been admissible to establish the truth of the plea; but without a plea of justification, such proof was clearly inadmissible. See 11 Hum., 507, 608. In Bush v. Prosser, 13 Barb., 221, where the slander charged the plaintiff with keeping a house of ill-fame, it was held that “evidence of unchaste and lascivious conduct of the plaintiff’s family, not establishing the offense, is inadmissible for any purpose;” and we hold, in this case, that the plaintiff’s action can not fail in consequence of the alleged bad reputation of her family. But, because of other errors in the record, let the judgment be reversed, and the cause remanded for a new trial.